Maxim B. RUPE, Plaintiff-Appellee, Cross-Appellant,

v.

SPECTOR FREIGHT SYSTEMS, INC., Defendant-Appellant,

and

Teamsters, Chauffeurs & Helpers Union, Local 279, Defendant-Appellee, Cross-Appellee.

Nos. 81–1490, 81–1590.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 13, 1982.

Decided May 28, 1982.

Clyde E. Craig, Wiley, Craig, Ambruster, Wilburn & Mills, St. Louis, Mo., James P. Baker, Springfield, Ill., for defendant-appellant.

Timothy L. Bertschy, Heyl, Royster, Voelker & Allen, Peoria, Ill., for plaintiff-appellee, cross-appellant.

Before SWYGERT and PECK,* Senior Circuit Judges, and ESCHBACH, Circuit Judge.

ESCHBACH, Circuit Judge.

The dispositive issue in these consolidated appeals pertains to the duty of fair representation which a local union owes to its members. Plaintiff Maxim Rupe (Rupe) instituted this action under § 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, against his former employer, Spector Freight Systems, Inc. (Spector), and his union, Local 279 of the Teamsters, Chauffeurs & Helpers Union (union), claiming that Spector breached the terms of the applicable collective bargaining agreement by failing to promote him to "seniority" employment status and by discharging him without just cause, and accusing the union

of breaching its duty of fair representation in processing his grievance against Spector. Rupe sought monetary relief against both Spector and the union and an order of reinstatement as a "seniority" employee at Spector. The case was tried before a jury. At the close of the evidence the district court granted a directed verdict in favor of the union on the basis that Rupe had failed to exhaust his intra-union remedies. The case against Spector was then submitted to the jury, which returned a verdict in favor of Rupe. Rupe was awarded a money judgment against Spector and the district court subsequently ordered Spector to rehire Rupe as a seniority employee. In No. 81–1490 Spector appeals from the judgment entered on the jury verdict, and in No. 81–1590 Rupe cross-appeals from the directed verdict in favor of the union. Because we find that there was insufficient evidence from which the jury could have inferred that the union breached its duty of fair representation, we affirm the judgment in favor of the union and reverse the judgment against Spector.

## I.

### FACTS

The applicable collective bargaining agreement provided for three employment classifications in Rupe's bargaining unit: "regular" (or "seniority"), "probationary" and "casual." Probationary workers were those who had not worked more than 30 days within 90 calendar days nor a total of 55 days during any twelve month period. After completing the probationary period, employees were classified as "regular" or "seniority" workers, whereupon they began to accrue seniority rights. Casual employees were in a completely different situation. Unlike seniority employees, casual workers were not required to work on a regular basis; they typically telephoned Spector from day to day to learn whether work was available.

* The Honorable John W. Peck, United States Senior Circuit Judge for the Sixth Circuit, sitting by designation.

In the fall of 1977 Rupe was hired as a casual worker at Spector's Decatur, Illinois freight terminal. Rupe signed a "waiver" of seniority rights in November of 1977. After working a total of 28 days, he was laid-off.

In the latter part of 1977, Waller, who was hired by Spector as a casual employee, filed a grievance challenging Spector's practice of requiring casual employees to waive their rights to accrue seniority. In the grievance proceeding the union contended that because it had not agreed to Spector's practice of hiring persons as casual workers, as required by the collective bargaining agreement,[1] the waivers were invalid and Spector could not prevent any employee from accruing seniority. The grievance committee agreed with the union, declaring the waivers invalid, and decided that Spector could not employ persons as casual workers without the union's consent.

In the aftermath of the Waller grievance the union initially took the position that it would not allow any employee to be classified as a casual worker. However, after discovering that a substantial number of employees who had previously signed waivers wished to maintain their "casual" employment status so that they would not be obligated to work on a regular schedule, the union agreed that Spector could permit workers who had previously signed waivers to voluntarily waive their seniority rights. Consequently, the union required Spector to contact all employees who had previously signed waivers and afford them the option of becoming seniority employees or remaining in the casual category, in which case they were required to execute a second waiver.

On January 20, 1978, having been recalled from layoff, Rupe resumed work with Spector and signed a second waiver of his seniority rights. The evidence is contradictory as to whether Rupe executed this second waiver voluntarily or whether a senior Spector employee told him that there would be no work for him if he did not sign.

Toward the end of 1978 Rupe applied to become a "regular" employee at Spector, with the attendant seniority rights. His application for seniority status was not only denied but he also received notice of his termination as a casual worker. After receiving notice of his discharge, Rupe asked the union president, James Hord, to intercede on his behalf. Hord telephoned Spector and was informed that Rupe had been discharged because he did not meet the company's "minimum requirements." When Rupe learned of Spector's response he asked Hord to file a grievance on his behalf. Proceeding upon the understanding that Spector was free to terminate casual employees such as Rupe without cause, Hord replied that he had done all he could to help Rupe and that it would do no good to file a grievance.

Rupe notified the National Labor Relations Board (NLRB) about his discharge and the union's refusal to file a grievance on his behalf and inquired as to how he might file formal charges with the NLRB against Spector and the union. After the NLRB notified Hord of Rupe's dissatisfaction Hord agreed to file Rupe's grievance against Spector.

Rupe met with Hord to prepare the grievance and gave his version of the events leading to his discharge. Hord made a transcription of Rupe's statement, asked Rupe to review it and make any changes necessary to reflect the facts accurately and then prepared and filed the grievance. Rupe never informed Hord about the circumstances surrounding his execution of the second waiver, nor did Hord question him about his execution thereof.

After filing the grievance Hord met with representatives of Spector to discuss Rupe's case. Hord was again informed that Rupe did not meet Spector's minimum requirements, but there was no revelation as to

---

**1.** Article 3 § 2 of the collective bargaining agreement provides as follows:

Any employee hired as a casual or part-time worker shall not become a seniority employ-

ee under these provisions where it has been agreed by the Employer *and Union* that he was hired for casual or part-time work. (emphasis added)

what these requirements were or what facts in Rupe's application caused his discharge. When Hord asked the company representatives why it had taken them over one and one-half years to decide that Rupe did not meet their minimum requirements, he was told that Rupe's application for employment was never processed until he applied for seniority status. Apart from this meeting with company officials and his earlier interview with Rupe, Hord made no further independent investigation into the facts surrounding Rupe's discharge.

Hord accompanied Rupe to the hearing before the grievance committee. Prior to the hearing Rupe had prepared a few notes which Hord read to the committee. After reading Rupe's statement Hord told the committee that he thought Rupe at least deserved a reason for being fired. The committee decided against Rupe, who thereafter instituted this action under § 301.

## II.

## EXHAUSTION OF INTRA–UNION REMEDIES

The local union's by-laws and the International Union's constitution provide for a complex system of intra-union procedures pursuant to which members may seek redress against union officers for violations of the union by-laws or constitution. The constitution mandates that members exhaust these intra-union remedies before seeking judicial relief against the union for breach of the duty of fair representation. Rupe failed to pursue these intra-union remedies with respect to his claim that the union failed to represent him fairly in the grievance proceeding. The directed verdict in favor of the union was predicated upon a

determination that Rupe's failure to exhaust his intra-union remedies precluded him from suing the union under § 301.[2] The district court's ruling relied upon prior decisions of this court which have construed the exhaustion requirement rather expansively. See, e.g., Baldini v. Local 1095, UAW, 581 F.2d 145 (7th Cir. 1978).

■ After the district court entered judgment in this cause the Supreme Court considered the exhaustion requirement in Clayton v. UAW, 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981). The Court held that "where an internal union appeals procedure cannot result in reactivation of the employee's grievance or an award of the complete relief sought in his § 301 suit, exhaustion will not be required with respect to either the suit against the employer or the suit against the union." Id. at 685, 101 S.Ct. at 2093. See also Tinsley v. United Parcel Service, 665 F.2d 778 (7th Cir. 1981) (on remand from the Supreme Court for reconsideration in light of Clayton). In Clayton, as in the instant case, the plaintiff sought reinstatement from his employer as well as monetary relief against both his employer and the union. The Court concluded that Clayton should not be required to exhaust his intra-union remedies since those remedies afforded no basis for reactivating his request for reinstatement and therefore would not afford relief as to all of his § 301 claims. Id., 451 U.S. at 696, 101 S.Ct. at 2099. In this case, as in Clayton, the union has not argued that Rupe could have been reinstated or that his grievance could have been reactivated if he had pursued his claim through the intra-union procedures. Under these circumstances, his failure to exhaust his intra-union remedies does not preclude him from suing the union and his employer under § 301.[3]

**2.** The union's motion for directed verdict relied upon two distinct grounds: (1) that Rupe failed to establish a breach of the union's duty of fair representation and (2) that Rupe failed to exhaust intra-union remedies. Although the district court failed to specify the basis for granting the motion for directed verdict, it is clear from the trial transcript that the motion was granted for failure to exhaust intra-union remedies.

**3.** To the extent that our holding on this point overrules this court's prior analyses of the exhaustion requirement in Tinsley v. United Parcel Service, 635 F.2d 1288 (7th Cir. 1980), vacated and remanded, 452 U.S. 934, 101 S.Ct. 3072, 69 L.Ed.2d 948 (1981); Baldini v. Local 1095, UAW, 581 F.2d 145 (7th Cir. 1978); Battle v. Clark Equip. Mfg. Co., 579 F.2d 1338 (7th Cir. 1978); Harrison v. Chrysler Corp., 558 F.2d 1273 (7th Cir. 1977); and Newgent v. Modine

## III.

## DUTY OF FAIR REPRESENTATION

■ Notwithstanding our disposition of the exhaustion issue, we may affirm the judgment in favor of the union if Rupe failed to establish a breach of the duty of fair representation.[4] Furthermore, such a failure of proof would require a reversal as to Spector since an employee may not prevail on a § 301 claim against his employer unless he demonstrates a breach of the duty of fair representation by his union. *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 570–71, 96 S.Ct. 1048, 1059–60, 47 L.Ed.2d 231 (1976).

■ As a corollary of its authority to act as the exclusive bargaining representative of the employees in Rupe's bargaining unit, *see* 29 U.S.C. § 159(a), the union was obligated to represent Rupe fairly in the grievance proceeding. *Hines, supra,* 424 U.S. at 564, 96 S.Ct. at 1056. In contrast to this obligation, however, a union, as a collective entity, is responsible for securing the contractual rights of all the members of a bargaining unit, including individuals whose interests may be adverse to the position of an individual grievant. Consequently, in handling a grievance,

> the Union must be allowed the discretion to balance many considerations and interests, including the effect of various resolutions of the grievance on other employees, the requirements of group organization and coherence, the desire for consistent treatment of similar claims, the appropriate allocation of limited resources for pursuing both individual and group claims, the maintenance of the Union's bargaining power and the necessity of maintaining an effective continuing relationship with the employer.

*Baker v. Amsted Industries, Inc.*, 656 F.2d 1245, 1250 (7th Cir. 1981) (citing *Vaca v. Sipes*, 386 U.S. 171, 182, 87 S.Ct. 903, 912, 17 L.Ed.2d 842 (1967)). For these reasons, a union must be accorded substantial discre-

tion in deciding whether and to what extent a particular grievance should be pursued. *Baker, supra,* 656 F.2d at 1250.

■ The basic formulation of the duty of fair representation requires that a union's conduct toward its members be neither "arbitrary, discriminatory [n]or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). Although "a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion, ... the individual employee [does not have] an absolute right to have his grievance taken to arbitration regardless of the provisions of the applicable collective bargaining agreement." *Id.* at 191, 87 S.Ct. at 917; *see Hines, supra,* 424 U.S. at 568–69, 96 S.Ct. at 1058–59. This standard strikes the proper balance between the rights of individual members and the responsibilities of the union to the collective interests of its membership.

■ Two quite distinct categories of actionable conduct are suggested by the *Vaca v. Sipes* formulation. The proscription of discrimination and bad faith connotes a fundamental requirement of even-handed representation. The terms "arbitrary" and "perfunctory," on the other hand, may imply a further requirement of basic diligence. It has been argued that even in the absence of evidence of bad faith or discrimination, the duty of fair representation may be violated by conduct which is so acutely perfunctory that it fails to attain a basic level of acceptable performance by a collective bargaining agent. *Hoffman v. Lonza,* 658 F.2d 519, 524 (7th Cir. 1981) (Cudahy, J., concurring). With respect to both standards of actionable conduct the employee bears a substantial burden of pleading and proof. To establish bad faith or discrimination, the union member must adduce "substantial evidence of fraud, deceitful action or dishonest conduct." *Hoffman, supra,* 658 F.2d at 522. Similarly, if mere lack of diligence is alleged, it is clear

---

Mfg. Co., 495 F.2d 919 (7th Cir. 1974), this result is mandated by *Clayton.*

4. We may affirm on any ground that finds support in the record. *Mims v. Board of Educ.*, 523 F.2d 711, 716 n. 2 (7th Cir. 1975).

that the employee must show something more than mere negligence, *id.* at 523; in this context, it has been suggested that the union's conduct must be shown to be "egregious," *id.* at 525 (Cudahy, J., concurring). In this case, however, we need not decide whether a gross lack of diligence, without more, would violate the duty of fair representation. Plaintiff Rupe failed to satisfy either of the standards of proof discussed above.

■ The essence of Rupe's case against the union is that Hord ought to have been a more effective advocate in the grievance proceeding. However, establishing a breach of the duty of fair representation involves more than demonstrating mere errors of judgment. *Cannon v. Consolidated Freightways Corp.*, 524 F.2d 290, 294 (7th Cir. 1975). Accordingly, Rupe seeks to buttress each of his specific objections to Hord's advocacy by arguing that evidence was presented from which the jury could have inferred that Hord acted in bad faith with respect to Rupe. Since a showing of "intentionally hostile or invidious action by a union is clearly relevant to determining whether the duty of fair representation has been breached," *Miller v. Gateway Transportation Company*, 616 F.2d 272, 277 n. 11 (7th Cir. 1980), we initially turn to the asserted evidence that Hord was prejudiced against Rupe.

Rupe's theory of union hostility is twofold. First, he claims that Hord filed the grievance only because Rupe had threatened to file charges against Hord with the NLRB. Second, he argues that Hord had a conflict of interest by virtue of the fact that Hord had previously stated in public that Rupe's grievance lacked merit. Accepting these allegations as true, they are insufficient, in light of all the other evidence, to support an inference of union animosity toward Rupe. Moreover, the facts offered in support of his theory of union hostility are not, of themselves, probative of bad faith.

There is no direct evidence that Hord harbored any animosity toward Rupe. Hord's remarks about the merits of Rupe's grievance merely reflect his honest belief that Spector was entitled to discharge Rupe without cause. Moreover, it is uncontroverted that Hord was not distressed over Rupe's overture to the NLRB. On the contrary, Hord processed Rupe's grievance even though he believed in good faith that it was wholly lacking in merit. We find further evidence of Hord's *good faith* in his statement to the grievance committee that Rupe at least deserved a reason for his discharge. In addition, on two separate occasions Hord tried to persuade Spector's representatives to reveal the basis for the company's decision to discharge Rupe.

■ Hord's failure to file the grievance until after he was contacted by the NLRB and his statement that Rupe's grievance lacked merit do not constitute a sufficient evidentiary basis to support an inference that Hord was hostile to Rupe and therefore processed his grievance in bad faith. Bearing that in mind, we turn to Rupe's specific assignments of error with respect to the processing of his grievance.

Rupe claims that the union breached its duty of fair representation by failing to: (1) argue that article 46 of the collective bargaining agreement, which prohibited Spector from discharging employees without just cause, applied to casual employees such as Rupe notwithstanding his execution of the second waiver, (2) perform a further investigation of the circumstances of Rupe's discharge, (3) prepare a written presentation for the grievance committee and (4) argue that Rupe's second waiver was invalid because it was executed involuntarily.

## A. Union's Interpretation of the Collective Bargaining Agreement

■ In *Tedford v. Peabody Coal Company*, 533 F.2d 952 (5th Cir. 1976), the United States Court of Appeals for the Fifth Circuit, applying the principles of *Vaca v. Sipes* and its progeny, posited a standard for assessing the propriety of a union's interpretation of a collective bargaining agreement if the union's interpretation varies from that of the grievant. Under the

*Tedford* test, the union's interpretation need not be correct in the ultimate analysis as long as it is at least a reasonable construction and is:

(1) based upon relevant, permissible union factors which [exclude] the possibility of it being based upon motivations such as personal animosity or political favoritism; (2) a rational result of the consideration of those factors; and (3) inclusive of a fair and impartial consideration of the interests of all employees.

*Id.* at 957. This court has previously quoted with approval the statement of principles from which the *Tedford* test is derived. *See Alvey v. General Electric Company*, 622 F.2d 1279, 1289 (7th Cir. 1980). We regard the *Tedford* test as an appropriate standard for assessing Rupe's claim that the union should have argued in the grievance proceeding that Rupe was protected by article 46 of the collective bargaining agreement.

Article 46 of the collective bargaining agreement proscribes the discharge of any "employee" without just cause. Hord interpreted the contract as an integrated document, however, and considered the just cause limitation in article 46 as applicable to only "seniority" employees, whereas "probationary" workers and "casual" workers such as Rupe could be terminated at will. The agreement does not indicate expressly whether casual employees may be discharged at will or whether they may be terminated only for just cause.[5] By contrast, articles 3 and 41 of the agreement expressly indicate that any "probationary" employee may be discharged "without further recourse." Although there was no comparable explicit statement regarding casual workers, Hord took the position that a casual employee, by waiving the right to seniority, remained in the status of a probationary employee and thus could be terminated without further recourse.

[11] Ineligibility for seniority was one attribute which casual and probationary employees clearly did share under the express terms of the contract. Article 41 denies seniority to any employee who has not completed the prescribed probationary period. Similarly, article 3 § 2 provides that "[a]ny employee hired as a casual or part-time worker *shall not* become a seniority employee under these provisions where it has been agreed ... that he was hired for casual or part-time work" (emphasis added). Since casual employees were expressly defined as something other than "seniority" employees there was a reasonable basis under the terms of the contract for concluding that casual employees enjoyed essentially the same rights as the other category of non-seniority employees, probationary workers. For this reason, and because probationary employees clearly could be terminated at will, it certainly was not unreasonable for Hord to conclude that the just cause limitation in article 46 did not apply to Rupe.

Hord's interpretation was also consistent with Spector's practices prior to the Waller grievance proceeding when the company followed a policy of laying off casual employees before they satisfied the probationary time limits. One obvious ramification of this policy was that it kept casual employees within the ambit of article 41, and thus they could be discharged at will. There is no indication that this particular disadvantage of casual status was challenged during the Waller grievance, nor is there evidence that the settlement of the Waller grievance was seen as having any impact on Spector's freedom to terminate casual employees.

In light of the ambiguities in the collective bargaining agreement, coupled with the enforced probationary status of casual employees prior to the Waller grievance, there existed ample grounds to support Hord's belief that Rupe was not protected by the just cause limitation in article 46 of the agreement. This interpretation, while not necessarily correct, was clearly reasonable.

---

5. Nor does the waiver instrument attempt to define what rights are waived by the execution thereof; it merely states that casual employees "will not gain any seniority."

Moreover, Hord's interpretation of the contract was consonant with the interests of many other casual employees in the bargaining unit. Spector required all "seniority" employees to work full time. If Hord had contended that a casual employee such as Rupe enjoyed the *rights* of seniority employees under article 46, he would also have been arguing, by implication, that casual employees were subject to the same *obligations* as seniority employees, including the obligation to work full time. Such an argument would have been prejudicial to the interests of the many part-time employees who did not wish to work full time.

Hord's interpretation of the contract was not tainted by any political favoritism or personal animosity toward Rupe. Rather, Hord's interpretation was reasonable and it reflected a fair and impartial consideration of the interests of other union members and casual employees generally. The union's interpretation readily satisfied the principles of *Vaca v. Sipes.*

### B. Failure to Investigate the Circumstances of Rupe's Discharge

Although Hord interviewed Rupe at some length and asked Spector's representatives on two separate occasions to provide an explanation for Rupe's discharge, the union made no further effort to gather the facts. The thoroughness of the union's investigation must be evaluated in light of Hord's rational and honestly held belief that Spector was free to terminate Rupe without further recourse. From such a perspective, further investigation would have been futile. Moreover, Rupe failed to alert the union to any matters which warranted further investigation.

The foregoing factors distinguish this case from other § 301 cases such as *Miller v. Gateway Transportation Company*, 616 F.2d 272 (7th Cir. 1980), and *Baldini v. Local 1095, UAW*, 581 F.2d 145 (7th Cir. 1978), which have held that summary judgment against an employee on the fair representation issue is inappropriate if the union has made no investigation into the circumstances surrounding the employee's griev-

ance. *Miller* and *Baldini* involved employees who had been discharged for *cause.* See 616 F.2d at 277; 581 F.2d at 152. In both cases, the situations giving rise to the employees' discharges were ripe for investigation by their unions: if the facts were as Miller and Baldini alleged, then their discharges would have been without just cause and their employers would have been obligated to reinstate them. Moreover, in *Baldini*, there were charges that the union had misled the employee into relying upon it to investigate the salient facts and that the union had failed to contact witnesses who assertedly would have corroborated the employee's version of the facts. 581 F.2d at 151–52. In *Miller* and *Baldini* there were grounds for inferring bad faith on the part of the union because the processing of the grievances was entirely perfunctory in light of the manifest need for further investigation. *See Hoffman v. Lonza*, 658 F.2d 519, 521 (7th Cir. 1981) (distinguishing *Miller* and *Baldini*).

█ In this case, there was no evidence that the union misled Rupe or spurned his requests for further investigation of material facts. Hord simply was not apprised of any facts or contentions that warranted further investigation. The limited investigation that he did perform was entirely adequate under the circumstances of this case. The union's investigation of the facts underlying Rupe's discharge was neither arbitrary, discriminatory nor in bad faith.

### C. The Union's Presentation to the Grievance Committee

█ Rupe's claim that the union should have prepared an independent presentation for the grievance committee must fail for essentially the same reasons as his argument regarding further investigation. Under Hord's good faith interpretation of the collective bargaining agreement, there were no additional arguments or factual disclosures which might have enhanced the prospects of Rupe's grievance; thus, any additional presentation by the union would have been fruitless.

### D. The Union's Failure to Contest the Validity of Rupe's Waiver

Rupe never told Hord or any other union official that he had been forced to execute the second waiver. Hord had been aware that some employees had been forced to sign waivers of seniority rights prior to the Waller grievance, but as part of the settlement of the Waller grievance Hord sought to ensure that employees who had previously executed waivers would be afforded a fair opportunity to reconsider and elect "seniority" status. Hord had required employees who re-executed the waivers to write their telephone numbers next to their signatures so that the union could contact them privately if any questions arose regarding the waivers.

Of the approximately eighty employees who had signed waivers prior to the Waller grievance, fifty-seven elected to re-execute waivers and remain casual employees, while twenty-seven elected to become seniority employees. It is significant that the union had received no complaints of coercion from the fifty-seven employees, *including Rupe*, who re-executed waivers. Moreover, the union *was* aware that Spector had permitted nearly thirty percent of the casual workers to become seniority employees. Hord's testimony that the union had no actual knowledge of any coercion in connection with the re-execution of the waivers is uncontroverted, and there is absolutely no basis for concluding that the union should have been aware of any such coercion. Under these circumstances, the union's failure to question the validity of Rupe's second waiver of seniority rights did not constitute a breach of its duty of fair representation.

Having considered all of the evidence of record in the light most favorable to Rupe, we hold that there was not substantial evidence from which the jury could have inferred that the union's handling of Rupe's grievance amounted to a breach of the duty of fair representation. The asserted grounds for inferring that the union was prejudiced against Rupe are insufficient as a matter of law to sustain a finding of bad faith. As to each of Rupe's discrete challenges to the handling of his grievance, the union's conduct was well within the range of acceptable performance by a collective bargaining agent. *See Vaca v. Sipes*, 386 U.S. 171, 191–92, 87 S.Ct. 903, 917–18, 17 L.Ed.2d 842 (1967). Nor was the union's conduct, when viewed as a whole, so perfunctory as to support an inference of bad faith.

Accordingly, in No. 81–1590 we affirm the judgment in favor of the union and in No. 81–1490 we reverse and remand for entry of judgment in favor of Spector.

AFFIRMED IN PART, AND REVERSED AND REMANDED IN PART.

JOHN W. PECK, Senior Circuit Judge, concurring.

I agree that the dispositive issue in these consolidated appeals is whether the union breached its duty of fair representation of Mr. Rupe in his grievance. I also agree that the evidence presented by Mr. Rupe in his action under Section 301 of the Labor-Management Relations Act was insufficient to support a finding that the union breached its duty. I therefore join in the decision to affirm the judgment in favor of the union and to reverse the judgment against Rupe's former employer. I write separately to express my view that this Court's decision in *Hoffman v. Lonza*, 658 F.2d 519 (7th Cir. 1981) mandates this result upon the facts of this case because the union's actions were not shown to be intentionally detrimental to Rupe.

In the present case the majority cites the majority opinion of *Hoffman* for the proposition that a union may breach its duty by conduct that is discriminatory or in bad faith. The majority in the present case cites the separate concurring opinion in *Hoffman* for the proposition that a union may breach its duty by conduct that is "egregiously negligent." The majority then concludes that Rupe failed to satisfy "either of the standards of proof."

I agree that the evidence was insufficient to support a finding that the union's actions

toward Rupe were "deliberately and severely hostile or irrational." *Hoffman, supra* at 522, *citing, Motor Coach Employees v. Lockridge*, 403 U.S. 274, 301, 91 S.Ct. 1909, 1925, 29 L.Ed.2d 473 (1971). However, the majority opinion in *Hoffman* rejects the argument that negligent conduct, whether or not it may be characterized as "egregious", may be the basis for an action for failure to fairly represent under Section 301 and makes it unnecessary for us to go beyond the question whether the union's conduct was intentionally "dishonest, in bad faith, or discriminatory." *Hoffman, supra* at 522 n. 2, *citing, Hines v. Anchor Motor Freight*, 424 U.S. 554, 571, 96 S.Ct. 1048, 1059, 47 L.Ed.2d 231 (1975).

I disagree with the majority's suggestion that something like gross negligence on the part of a union may violate the "duty of fair representation."[1] In citing the concurring opinion in *Hoffman*, the majority here suggests that lack of diligence or that negligence by a union that can be characterized as "egregious" may be sufficient to constitute a breach of the union's duty. This argument was rejected by the majority in *Hoffman*, which stated, "[T]he courts may enforce the duty of a union to fairly represent an employee only when the union conduct breaching the duty is intentional, invidious, and directed at the employee, *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 301, 91 S.Ct. 1909, 1925, 29 L.Ed.2d 473 (1971)." Concepts of "negligence" or "lack of diligence" by definition refer to unintentional conduct, and such conduct may not constitute a breach of the duty to "fairly represent." On the other hand, the adjectives "arbitrary" and "perfunctory", which have often been used to describe conduct

breaching the duty, by definition refer to intentional conduct, *Ruzicka v. General Motors Corp.*, 523 F.2d 306, 315 (6th Cir. 1975) (McCree, J., concurring). I do not agree with the majority here that "arbitrary" or "perfunctory" conduct includes unintentional, negligent conduct.[2] Modifying the concepts of "negligence" or "lack of diligence" with the adjective "egregious" merely defines a degree or level of unintentional conduct. It does not convert that conduct to the intentional conduct required by the Supreme Court cases cited in *Hoffman*.

Consequently, I am of the view that the majority's statement that "we need not decide whether a gross lack of diligence, without more, would violate the duty of fair representation," is inappropriate. That question has already been answered, and, I find it unnecessary to consider whether Rupe presented evidence of gross negligence by the union in handling his grievance.

SWYGERT, Senior Circuit Judge, dissenting.

The majority reverses the jury verdict that found the union in breach of its duty of fair representation. The union was obligated to represent Rupe fairly in the grievance proceeding. *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 564, 96 S.Ct. 1048, 1056, 47 L.Ed.2d 231 (1976). The union's representation must not be "arbitrary, discriminatory or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 190, 87 S.Ct. 903, 916, 17 L.Ed.2d 842 (1967). The majority correctly notes that actionable conduct under this standard falls into two distinct categories: even-handed representation (*i.e.*, neither discriminatory nor in bad faith) and diligent

---

1. As stated in *Hoffman*, confusion arises by the use of the term "duty of fair representation." The Supreme Court cases limiting these actions to situations where a union deliberately acts against an employee's interests clearly demonstrate that the "fairness" of the outcome or the quality of representation is not a primary concern. *Hoffman v. Lonza*, 658 F.2d 519, 522 (7th Cir. 1981).

2. In this vein, I find nonsensical the statement in *Robesky v. Qantas Empire Airways, Ltd.*,

573 F.2d 1082, 1089 (9th Cir. 1978) (cited by the Hoffman concurrence) that,

"Arbitrary" conduct is not limited to intentional conduct. For example, to "ignore a meritorious grievance or process it in a perfunctory fashion" may be arbitrary.

In my view to ignore is to act purposely and therefore intentionally. To act in a perfunctory manner likewise requires intentional conduct that is capricious or superficial. *Ruzicka v. General Motors*, 523 F.2d 306, 315 (6th Cir. 1975) (McCree, J., concurring).

representation (*i.e.*, neither arbitrary nor perfunctory). Viewed from both perspectives, I would affirm the jury's verdict.

It is imperative to understand our standard of review in this case. A jury verdict is not lightly set aside; we must affirm it so long as it has any reasonable basis in the record. *Wyant v. J. I. Case Co.*, 633 F.2d 1254, 1256 (7th Cir. 1980). We must review all the evidence in the light most favorable to the prevailing party. *Smith v. Rogers*, 290 F.2d 601, 602 (7th Cir. 1961). We are not to substitute our judgment for that of the jury, and we cannot usurp the jury's function as the finder of fact. *Collins v. Signetics Corp.*, 605 F.2d 110, 115 (3d Cir. 1979). In particular, determining the credibility of witnesses and the weight to be accorded testimony are matters peculiarly within the province of the jury. *Pinkowski v. Sherman Hotel*, 313 F.2d 190, 193 (7th Cir. 1963). I believe that the majority has ignored all of these admonitions.

### I

The majority denies that there is sufficient evidence to show that the union harbored animosity towards Rupe. The evidence showed that Hord, the union representative, told Rupe that his grievance was meritless and refused to file it. Hord eventually did file the grievance, but only after Rupe complained to the NLRB. The majority concludes that Hord's refusal to process the grievance was based upon an honest belief that Rupe could be discharged without cause. This may or may not be true, but it is not our role to make this determination. The jury is to decide what beliefs Hord had, whether they were honestly held, and what motivated his actions. The majority improperly weighs the evidence and draws certain inferences to reach its conclusion that Hord harbored no animosity toward Rupe. Viewing the evidence in the light most favorable to Rupe, a jury could rationally conclude that Hord harbored animosity toward Rupe based upon his refusal to process the grievance until after Rupe complained to the NLRB.

### II

The majority also denies that there is sufficient evidence of arbitrary and perfunctory conduct by the union in its processing of Rupe's grievance. Nonetheless, the evidence showed that the union (1) failed to argue that article 46 of the collective bargaining agreement (which prohibited Spector from discharging employees without just cause) applied to Rupe as a casual employee, (2) failed to perform any investigation of the circumstances surrounding Rupe's discharge, (3) failed to prepare a written presentation for the grievance committee, and (4) failed to argue that Rupe's second waiver was invalid because it was executed involuntarily.

The majority attempts to show that Hord had a reasonable and honest belief that article 46 of the collective bargaining agreement did not cover Rupe, and so his failure to perform all these actions was understandable. Perhaps it was. Determining what Hord honestly believed about the contract, however, is a matter for the jury. Similar remarks apply to the majority's analysis of the other failures to act. These omissions may seem reasonable to the majority; but we are not the trier of fact. We do not determine credibility, weigh the evidence, or substitute our judgment for that of the jury. Our job is to determine whether there was any reasonable basis in the record for the jury's verdict. If the evidence is viewed in the light most favorable to Rupe (as we must), the union's failure to act in these four ways is sufficient to support the jury's verdict. Our scope of review extends no further.

It is undisputed that the union processed Rupe's grievance only after he filed a charge with the NLRB, failed to investigate the circumstances surrounding Rupe's discharge, prepared no written statement for the grievance committee, and failed to raise two arguable defenses on Rupe's behalf. I do not understand how the majority can say that no reasonable jury could conclude on the basis of these facts that the union failed to meet its duty of fair representation. *See Miller v. Gateway Transportation Co.*, 616 F.2d 272, 277 (7th Cir. 1980).

I concur in Part II of the majority's opinion. For this reason, I would affirm the judgment in favor of Rupe against Spector, and reverse and remand for entry of judgment in favor of Rupe against the union.